Kelly K. LoCascio, Esq., SBN 022793
Randy A. McCaskill, Esq. SBN 024772
8014 E. McClain, Suite 220
Scottsdale, Arizona 85260
Telephone:  (877) 264-3570
Facsimile: (888) 883-9506
klocascio@angelmedflight.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DESTINY MCCARRICK, a single woman,<br><br>Plaintiff,<br><br>v.<br><br>CONNECTICUT GENERAL LIFE INSURANCE COMPANY, a Cigna Corp. company, a Delaware Corporation; and BLUEGREEN CORPORATION GROUP BENEFITS PLAN,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT** |

For Plaintiff Destiny McCarrick's Complaint against Defendants Bluegreen Corporation Group Benefits Plan and Connecticut General Life Insurance Company, a Cigna Corp. company, Plaintiff states and alleges as follows:

**JURISDICTION AND VENUE**

1

1. This Court has jurisdiction over this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), pursuant to 29 U.S.C. §§ 1132(e) and (f) and 28 U.S.C. § 1331.

2. Venue is proper under 29 U.S.C. § 1132(e) because Defendants are found in this District.

## PARTIES

3. Plaintiff Destiny McCarrick is an individual residing in the State of Florida.

4. At all relevant times hereto, Plaintiff was employed by Bluegreen Corporation ("Bluegreen") and a participant in the Bluegreen Corporation Group Benefits Plan ("the Plan").

5. Bluegreen maintains offices and does business within the State of Arizona and is a fiduciary under the Plan.

6. The Plan is an Employee Health Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

7. Connecticut General Life Insurance Company is a Cigna Corporation company, a Delaware corporation ("CG"), and licensed to do business and is in fact doing business in State of Arizona. By definition, CG was also a claims fiduciary of the Plan under ERISA.

8. Pursuant to the terms of the Plan, Bluegreen had discretionary authority to make final decisions regarding the payment of Plan medical benefit claims, and delegated that authority to CG.

## FACTUAL ALLEGATIONS

9. Aviation West Charters, Inc., doing business Angel Jet Services (collectively "AJS"), is a worldwide fixed-wing air ambulance service provider. AJS utilizes medically customized specialty aircraft to transport patients.

2

10. Aviation West Charters, Inc. is a Colorado corporation that is authorized to do business and is in fact doing business in Arizona. Aviation West Charters, Inc. maintains its headquarters in Scottsdale, Arizona in Maricopa County.

11. Aviation West Charters, Inc. purchased Angel Jet Services, LLC in September 2011.

12. AJS is an Arizona limited liability company.

13. Aviation West Charters, Inc. is the successor-in-interest to AJS.

14. AJS's services include flight coordination, patient assistance, coordination between sending and receiving medical providers, and transportation from one facility to another facility under the care of trained professional medical service providers (including critical care nurses) throughout the entire transport.

15. On August 9, 2011, Ms. McCarrick was a passenger on a motorcycle when she was violently struck by another motorcycle in or about Sturgis, South Dakota.

16. Plaintiff suffered massive injuries to her left leg and was rushed to Rapid City Regional Hospital for emergency amputation and femur stabilization.

17. Upon arrival at Rapid City Regional Hospital, Ms. McCarrick was examined by Dr. Sufficool. Dr. Sufficool found that the nerve supply was disrupted and merely held together with a portion of the gastrocnemius muscle and some posterior skin.

18. Ms. McCarrick was prepped for transtibial amputation. Utilizing a power saw, Ms. McCarrick's lower left extremity was amputated.

19. Intraoperatively, Ms. McCarrick's care was transferred to the orthopedics team led by Dr. Kadrmas. Dr. Kadrmas evaluated Ms. McCarrick's knee laceration and femur fracture and ultimately chose to perform intramedullary rod fixation surgery to the left comminuted segmental femur fracture utilizing a Synthes lateral entry femoral nail with interlocking screws.

20. Utilizing a scalpel blade, Ms. McCarrick's nonviable skin, tissue and fascia

were debrided, the surgical site was irrigated, and antibiotics were administered.

21. Ms. McCarrick was placed in a knee immobilizer as a result of the emergency surgery precluding her from moving her broken femur or disturbing the amputation.

22. Ms. McCarrick's amputation was plagued by complications including extreme pain, blisters, and postoperative anemia. Ms. McCarrick received a series of blood transfusions during her hospitalization. Suffering from unimaginable pain and wild dreams, Ms. McCarrick's healing was further complicated by fatigue.

23. Upon completion of the surgery, Dr. Kadrmas ordered that Ms. McCarrick transfer to Florida for long-term follow-up care.

24. Dr. Sufficool executed a Letter of Medical Necessity for Ms. McCarrick. Dr. Sufficool stated that Ms. McCarrick needed to be transported by air ambulance to Brooks Rehabilitation Hospital in Jacksonville, Florida to allow Ms. McCarrick obtain the highest quality rehabilitation services available as well as provide her support and education for her post-amputation lifestyle changes and complex medical complications resulting from her injuries and subsequent medical care.

25. The case managers at Rapid City Regional arranged for AJS to provide facility-to-facility transport to Brooks Rehabilitation Hospital as soon as Ms. McCarrick was stable for transfer.

26. The AJS medical team transported Ms. McCarrick in a fixed-wing Learjet in a semi-fowlers position on a stretcher precluding any movement in her broken and amputated leg.

27. The AJS medical team elevated the amputated leg during the flight and attempted to assist Ms. McCarrick to reposition during flight for comfort. Because of the pain Ms. McCarrick remained in a low-fowlers position throughout the entire flight. During the transport, Ms. McCarrick required Vicodin and Flexeril for her pain and spasms.

4

28. At Brooks Rehabilitation Hospital, AJS transported Ms. McCarrick to her receiving bed and care was transferred to the medical staff at the receiving facility.

29. While at Brooks Rehabilitation Hospital it was discovered that Ms. McCarrick's femur rod was surgically misplaced by approximately 60 degrees requiring complicated corrective surgery. It was also discovered that Ms. McCarrick's tibia and fibula had a length discrepancy precluding her from being a candidate for a prosthetic leg until she was accepted for another specialized surgery to correct the damage.

30. Ms. McCarrick suffered significantly from changes to her body structure and function.

31. In this case, early post-operative complications impacted Ms. McCarrick's ability to participate in the stages of amputee rehabilitation and influenced her overall prognosis and treatment design.

32. Post-amputation patients are generally seen five to seven time a week to implement positioning, exercise, mobility and, if appropriate, participate in therapy programs. On a daily basis, patients are evaluated on their range of motion, muscle performance, skin integrity, quality of movement, pain intensity, and functional mobility.

33. After transfer to Brooks Rehabilitation Hospital, Ms. McCarrick suffered from an aggressive e-coli infection at the amputation site causing her to spend ten days in hospital quarantine. After she was able to leave quarantine, Ms. McCarrick was required to wear a wound VAC for several months.

34. A home health care nurse was ordered to assist Ms. McCarrick upon discharge because of her difficult and sometimes unpredictable condition.

35. Ms. McCarrick was only able to receive the level of care and meet with prospective orthopedic specialists for her corrective surgery because she was transported to Florida by air ambulance.

36. Emotionally, Ms. McCarrick had a difficult time coping with not only the loss of her limb but also the fact that her surgeries were incorrectly done leaving her without the ability to receive a prosthetic. Ms. McCarrick was placed on antidepressants. As a result, Ms. McCarrick's support team in Florida was exceptionally important.

37. Because Ms. McCarrick was suffering from continuous infection and could not receive a prosthetic, Ms. McCarrick's mother moved in with her to help with daily activities including cooking, hygiene and managing her amputation site.

38. Because of her fatigue and the amount of medication Ms. McCarrick was taking, it was dangerous for her to shower without assistance. Ms. McCarrick's mother was able to assist her with these daily activities.

39. Ms. McCarrick's father and step-mother are also located in Florida and transported her to every doctor appointment which helped give Ms. McCarrick's mother a break from her daily assistance responsibilities for Ms. McCarrick.

40. After the transport was complete, AJS submitted a CMS 1500 Health Insurance Claim Form to CG for $361,990 for its air ambulance services.

41. The services rendered by AJS were benefits to which Ms. McCarrick was entitled as the insured under the terms of the Plan.

42. In response to AJS's request to have its air ambulance transportation services paid for, CG issued an Explanation of Benefits ("EOB") on or about September 6, 2011 denying the claim.

43. In its September 6, 2011 denial, CG failed to provide a written explanation stating the grounds for its denial. Instead, CG states that the written explanation of the reason for denial and the right to appeal were mailed under separate cover.

44. On information and belief, the basis for CG's denial is found within a letter dated August 23, 2011 from CG denying a pre-authorization request made by AJS.

45. The August 23, 2011 benefit determination states that Ms. McCarrick's

6

claim for air ambulance services was denied for:
>CATEGORY OF TREATMENT(S):  Outpatient
>GUIDELINE USED FOR DENIAL:   Cigna Coverage Position Critertia
>SPECIFIC GUIDELINE USED:   Non-emergent Air Ambulance transport

46. Ms. McCarrick's Plan specifically states that "every notice of an adverse benefit determination will include reference to the specific plan provisions on which the determination is based." No such information was contained within either denial document.

47. On March 2, 2012, AJS submitted an appeal on Ms. McCarrick's behalf.

48. In an unsigned letter dated April 9, 2012, CG provided a response to AJS's appeal affirming the denial on the basis that air ambulance transport was not medically necessary because the following criteria was not met:

- transportation from the site of the injury, accident or trauma to the nearest hospital where the needed medical care and treatment can be provided and when conventional ambulance would impede timely intervention of medical care
- transportation from a remote area, either by air or land, which may or may not be out of the United States, to the nearest hospital, where medical treatment can be rendered
- transportation from a facility which is not equipped or staffed to treat the patient's specific injury or trauma and conventional ambulance would impede timely intervention of medical care
- patient transport when there is a medically compelling reason contradicting the use of another means of transportation

49. The denial does not adequately contain the basis of denial, adhere to time limits applicable to decisions on claims and appeals, provide documents requested under 29 C.F.R. § 2560.503-1(h)(3)(ii)-(iv), or provide other information required under ERISA claims regulations.

50. Ms. McCarrick has satisfied all of the jurisdictional prerequisites, including

7

exhaustion of administrative remedies, to filing a claim in federal court.

## COUNT I
### RECOVERY OF INSURANCE AND PLAN BENEFITS

51. Ms. McCarrick incorporates and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

52. A participant is entitled to recover benefits under the terms of the plan, to enforce rights under the terms of the plan, and to clarify rights to future benefits under the terms of the plan subject to 29 U.S.C. § 1132(a)(1)(B).

53. A civil action may be brought by a participant (A) to enjoin any act or practice which violates any provision of Title I of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of Title I of ERISA or the terms of the plan subject to 29 U.S.C. § 1132(a)(3).

54. Ms. McCarrick reasonably expected that the services were covered and met any applicable requirements under the Plan and that benefits would be awarded.

55. Despite having coverage for air ambulance services under Ms. McCarrick's Plan, CG and the Plan improperly denied benefits in breach of the Plan.

56. The Plan's decision was tainted by a structural conflict of interest that requires that its decision be reviewed with increased skepticism.

57. The Plan's procedural violations of ERISA and its regulations also require that the decision be reviewed with increased skepticism.

58. CG and the Plan's breach was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence and was clearly erroneous and in violation of § 503 of ERISA.

59. Ms. McCarrick is entitled to declaratory, injunctive and other appropriate equitable relief, together with attorneys' fees and costs.

**WHEREFORE,** Ms. McCarrick demands judgment against the Plan as follows:

8

A. Declaring that Ms. McCarrick is entitled to payment of services rendered by AJS in the amount of $361,990.00 as a result of Defendants' violation of the terms of the Plan and ERISA by failing to pay for the services AJS rendered to Ms. McCarrick;

B. Ordering Defendant to reimburse Ms. McCarrick for all out-of-pocket expenses, incurred as a result of the Plan Administrator's unreasonable interpretation of the Plan Regulations as equitable relief;

C. Declaring that the Plan violated ERISA's claims procedures and disclosure requirements, ERISA § 503 and regulations thereunder;

D. Enjoining Defendants to cease and desist from violating ERISA and the terms of the Plan;

E. Awarding pre-judgment interest at the highest rate allowable by law;

F. Awarding reasonable attorneys' fees and costs pursuant to state law and ERISA § 502(g); and

G. Awarding such other and further relief as the court deems just and proper.

DATED this 7th day of August, 2012.

By  /s/Kelly K. LoCascio
    Kelly K. LoCascio, Esq.
    Randy A. McCaskill, Esq.

4817-0686-1840, v. 1